TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-10-00712-CV






Dennis Davis, Individually and d/b/a Aqua Tech Marine Industries;

Debbie Desmond, Individually and d/b/a Aqua Tech Marine Industries;

and Aqua Tech Marine Industries, Inc., Appellants


v.


Steven L. Johnston, Maria Estella Arguinde-Johnston, Stephen H. Gay

and Carilynne Yaffe Gay, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT

NO. D-1-GN-06-00403, HONORABLE RHONDA HURLEY, JUDGE PRESIDING



 

M E M O R A N D U M O P I N I O N


 This appeal arises from a dispute concerning the existence and scope of easements
that were alleged to burden two waterfront lots on Lake Travis. One of the lots is owned by
appellant Dennis Davis and the other by appellant Debbie Desmond. Davis and Desmond are jointly
engaged in a business known as Aqua Tech Marine Industries, which had conducted its operations
on the lots since 2004. Following a bench trial, the district court rendered judgment declaring that
the Davis and Desmond lots are burdened by easements appurtenant permitting two married couples
who each own residential lots in the area--the Johnstons and Gays, appellees--to traverse the Davis
and Desmond lots to access the lake waters, attach boats and floating docks to the lots, and linger
upon and use the lots for various recreational activities. The judgment further declared that the
two waterfront lots are burdened by a "negative implied restrictive covenant" prohibiting commercial
use, in effect outlawing Aqua Tech's operations there. The district court subsequently made findings
of fact and conclusions of law that the positive easement burdening the Davis and Desmond lots
existed by virtue of express grant, estoppel, implication, and prescription.

 Davis, Desmond, and Aqua Tech appealed, challenging primarily the legal and factual
sufficiency of the evidence supporting each easement theory on which the district court relied. While
we affirm, under a prescription theory, the district court's declaration that a positive easement
burdens the properties, we will reverse its declaration that a "negative implied restrictive covenant"
bars the lots' commercial use and remand the cause to the district court for further proceedings made
necessary by these holdings.



BACKGROUND

Some geography

 All of the properties at issue are located on the Graveyard Point peninsula on
Lake Travis, not far from the present-day City of Lakeway. The geographic relationship of these
properties and others described herein is best understood by referring to Appendix A, a 2003 map
prepared by Travis Central Appraisal District that was in evidence at trial.

 At relevant times, the Gays and Johnstons have owned adjacent groups of lots
bordering Oak Hurst Road, whose path is depicted as an inverted "U" traversing the lower left corner
of Appendix A. These lots are each situated below or to the south of Oak Hurst and a short distance
to the right or east of the apex of the street's inverted "U." (1) Since 1999, the Gays have owned the
three lots labeled in Appendix A with their names, one of .325 acres and the other two are
each roughly half that size. To the immediate lower right or southeast of the Gays' .325-acre lot is
a lot labeled "Todd & Ann Kimbriel." Below or to the south of the "Kimbriel" lot are five lots of
varying sizes and shapes, bordered to the right (east) by Oak Hurst, to the lower left (southwest) by
Rabbit Run Circle, and to the bottom (south) by Max Drive. These five lots were all acquired by the
Johnstons between 2001 and 2002. Subsequent to the date Appendix A was prepared, in 2006, the
Johnstons purchased the "Kimbriel" lot as well.

 The lots now owned by appellants Davis and Desmond are located along the eastern
Lake Travis shoreline depicted in the lower center of Appendix A. In 2005, Davis would purchase
the roughly 1-acre lot labeled "Annie Stewart Estate," which encompasses a portion of shoreline
that bends to the west and then southeastward around a cove, then turns northward. In 2006,
Desmond would acquire the .16-acre lot, labeled "Thelma Stewart," that is immediately adjacent to
the Davis lot as the shoreline continues northward. With evident reference to the configuration of
these properties' boundaries or the Lake Travis shoreline within them, the parties and witnesses have
termed the Davis property "the Point" and Desmond's "the Notch," and we will do the same.


Some history

 Some historical background concerning the ownership and development of these and
other Graveyard Point properties is helpful in understanding and analyzing the issues on appeal.
Most if not all of the land comprising the present-day Graveyard Point once was owned by the late
Annie Stewart (the same person whose estate had owned the Point until Davis purchased it in 2005)
and her late husband, A.K. The couple and other members of the Stewart family had farmed and
ranched along the Colorado River for decades before the construction of the Marshall Ford dam
downstream formed Lake Travis--and created the peninsula now known as Graveyard Point--in the
early 1940s. In fact, an old Stewart family cabin predating Lake Travis still stands on what is now
a residential lot situated at the north or top side of the intersection of Chipmonk and Hurst View.
That lot and cabin, coincidentally, were acquired by appellant Desmond in 1998, and the record
reflects that she and appellant Davis resided there through time of trial.

 In connection with Lake Travis's formation, large portions of the Stewarts' acreage
were burdened with overflow easements in favor of the Lower Colorado River Authority (LCRA)
up to, originally, the elevation contour of 670 feet above mean sea level (m.s.l.), and later up to
715 feet m.s.l. Although these changes greatly limited the Stewarts' agricultural use of their land
(at least if one assumes the lake remains anywhere close to the 681 feet m.s.l. elevation at which it
is considered "full"), they also had the salutary effect of transforming the Stewarts' remaining
acreage into "lakefront" property suitable for residential or recreational development.

 The couple began subdividing and selling residential lots on Graveyard Point in 1943.
As lots were being developed, the Stewarts retained ownership of adjacent strips of land over
which private roads were cut to provide access. The first lots conveyed by the Stewarts in 1943 and
through mid-1944 were generally of precisely one acre in size, rectangular in shape, with long sides
oriented perpendicularly to the eastern shore of Graveyard Point, and located between the paths
of present-day Chipmonk and Oak Hurst as those roads continue southward and below the area
depicted in Appendix A. The eastern or lakeside boundaries of these lots, as well as this portion of
Chipmonk, corresponded roughly to the 715 m.s.l. contour that marked the upper limits of the
LCRA's overflow easement. In these early conveyances, the Stewarts typically granted the lot
owners an easement appurtenant permitting use of the "roadway now open on the East of the
land herein conveyed"--the road now known as Chipmonk. The Stewarts also typically granted an
easement across the land they continued to own between the lot's eastern boundary and the 670 m.s.l.
contour "for the purpose of ingress and egress from the tract of land herein conveyed to Lake Travis
and to the property owned by the Lower Colorado River Authority."

 In September 1944, the Stewarts conveyed title to four additional rectangular lots
located between portions of present-day Chipmonk and Oak Hurst that are situated roughly north and
northwest of the eventual site of appellees' lots, with long sides oriented roughly perpendicularly
with the northern shore of Graveyard Point. Similar to the earlier conveyances, the Stewarts granted
easements permitting lot owners use of "the roadway now open on the North" (the road now known
as Chipmonk) and use of the Stewart-owned property lying to the north for "ingress and egress"
to Lake Travis down to the 670 m.s.l. contour. During the decades ahead, disputes concerning the
scope of these easements between successors to the Stewarts and the original grantees would
spawn at least three appeals to this Court, including two we decided very recently. See Harbor
Ventures, Inc. v. Dalton, No. 03-10-00690-CV, 2012 WL 1810205 (Tex. App.--Austin May 18,
2012, no pet. h.) (mem. op.); Dee v. Crosswater Yacht Club, LP, No. 03-10-00796-CV, 2012 WL
1810213 (Tex. App.--Austin May 18, 2012, no pet. h.) (mem. op.); Schlapper v. Forest,
No. 03-06-00315-CV, 2010 WL 3370289 (Tex. App.--Austin Aug. 24, 2010, pet. denied)
(mem. op.).

 In early 1945, A.K. Stewart died, and Annie, on her own behalf and as executor
of A.K.'s estate, continued developing the couple's Graveyard Point property. In April 1945, a
surveyor named O.P. Schoolfield surveyed the subdivision of fourteen residential lots located farther
to the peninsula's interior than those the Stewarts had previously conveyed. These included six lots
of roughly .325 acres each situated to the south of the road now known as Oak Hurst, near the apex
of that road's inverted "U." Four of these six lots are in appellees' chains of title, and include the
entirety of the property later acquired by the Gays and the northernmost two of the lots later acquired
by the Johnstons.

 The Schoolfield survey was certified in May 1945. On May 23, 1945, Annie
conveyed two of the lots to predecessors in title of the Johnstons--the lot designated in Appendix A
as the "Kimbriel" lot to Louis Dolan and Herbert Rehfield, and the lot immediately adjacent on the
south to Fred and Margaret Sassman. A few days later, on May 29, Annie conveyed the lot on the
opposite side of the Dolan lot--the lot that is now the larger, .325-acre owned by the Gays--to
Aubrey and Estelle Frazer. During the following month, Annie conveyed the third lot to the west
of the Frazer lot, which is not in appellees' chains of title, to Milas and Erna Dyer. Annie would not
convey the remaining two lots situated between the Frazer lot and the Dyer lot until the following
year. In April 1946, Annie conveyed the lot adjacent to the Dyer lot, which is not in appellees'
chains of title, to Floyd and Myrtle Gibson. In May 1946, Annie conveyed the remaining lot,
situated between the Gibson lot and the Frazer lot, to Leslie and Chester Ross, predecessors in title
to the Gays. The grantees of the Ross lot or their successors would later subdivide it into the
two smaller lots the Gays now own. To aid in distinguishing these and subsequent conveyances
from Annie Stewart or her estate to appellees' predecessors in title, we will hereinafter identify
each of the lots in appellees' chains of title by the name of its original grantee and have prepared a
modified version of Appendix A, Appendix B, on which we have labeled each lot with the original
grantee's name.


 As is apparent from both Appendix A and B, the six lots to the south of present-day
Oak Hurst that were subdivided by the 1945 Schoolfield survey, unlike those previously conveyed
by the Stewarts, were partially land-locked by property that the Stewarts had already conveyed
to third parties. In contrast to the Stewarts' prior easements granting "ingress and egress to
Lake Travis" directly over intervening Stewart-owned land, Annie's 1945 deeds to the Sassman,
Dolan, Frazer, and Dyer lots each granted an easement appurtenant permitting "ingress and egress to
Lake Travis" via a "roadway now open." Specifically, in the deed to the Sassman lot later acquired
by the Johnstons, Annie granted the following express easement:


It is hereby agreed and understood that the roadway now open on the East of the land
herein conveyed shall always be open and shall never be closed by any party, and
grantee shall have the right to use this roadway for the purpose of ingress and egress
to Lake Travis.



On the same day, Annie granted what the parties agree is a materially identical easement in her deed
to the Dolan lot later acquired by the Johnstons. (2) Similarly, in her May 29, 1945 deed to the Frazer
lot later acquired by the Gays, Annie granted an easement identical to that in the Sassman deed,
except for the directional language:


It is hereby agreed and understood that the roadway now open on the Northeast of the
land herein conveyed shall always be open and shall never be closed by any party,
and grantees, their heirs and assigns, shall have the right to use this roadway for the
purpose of ingress and egress to Lake Travis.



(Emphasis added.) And, in her Dyer deed the following month, Annie granted the same easement
with a third variant in the directional language:


It is hereby agreed and understood that the roadway now open on the North of the
land herein conveyed shall always be open and shall never be closed by any party,
and grantees, their heirs and assigns, shall have the right to use this roadway for the
purpose of ingress and egress to Lake Travis.



(Emphasis added.) However, in her subsequent deed to the Gibson lot in April 1946, as well as
her May 1946 deed to the Ross lot in the Gays' chain of title, Annie did not grant any easement
permitting use of roads or access to Lake Travis.

 Between 1947 and 1950, Annie subdivided and conveyed the next three lots along
present-day Oak Hurst that lie to the south of the Sassman lot, all of which were later acquired by
the Johnstons--identified in Appendix B, with reference to the names of the original grantees, as the
"Menn," "Offutt No. 1," and "McClanahan" lots. In each of these deeds, Annie granted an easement
appurtenant permitting use of "the roadway now open on the East of the land herein conveyed" or
"the roadway situated East of this land herein conveyed," but did not explicitly state that these
easements were for the purposes of providing access to Lake Travis.

 Meanwhile, Annie also conveyed substantial portions of her property among her and
A.K.'s seven children. These included eight lots on the north and east side of present-day Oak Hurst
that, along with the six lots previously discussed, had been subdivided by the 1945 Schoolfield
survey. The Stewart family cabin was encompassed within one of these lots, which Annie conveyed
by gift deed to her son, Arthur, reserving a life estate for herself. As it appears in the Schoolfield
survey and was conveyed to Arthur, the boundaries of this lot encompassed not only the entirety of
the present-day lot containing the cabin that was later acquired by Desmond, but also the path of
present-day Hurst View that now runs adjacent to the Desmond lot and a portion of the present-day
lot on the opposite side of Hurst View. Later, in 1949, Annie conveyed to each of her children, via
gift deed, his or her own tract of roughly two acres of relatively low-lying land along the northern
and eastern shoreline of Graveyard Point. The seven tracts encompassed an area extending from
the peninsula's northern tip to immediately north of, but not including, the areas that later became
known as the Point and Notch. During the ensuing decades, some of the children, but not all, would
subdivide their respective tracts into smaller residential lots. Moreover, Emmet Stewart, to
whom Annie had gifted the tract immediately north of the Point and Notch area, would operate a
marina and rental cabins on his property beginning by at least the 1960s. The business remained in
operation until a July 1970 tornado destroyed it.

 Annie and A.K.'s development of their Graveyard Point property brought physical
changes to the peninsula, including new roads, that were reflected in aerial photographs in evidence
at trial. In the earliest photograph, dated 1940, the Stewart family cabin is visible, as is a road
running northward from that area along roughly the path of present-day Blue Cat. Another road is
also seen, running roughly north-south across what is now the western portion of the Graveyard
Point peninsula. As demonstrated by other evidence, this latter road was Hurst Creek Road, a
public road predating the construction of Mansfield Dam. Hurst Creek Road originally continued
northward past what became the peninsula's northern shore into areas that were later inundated by
Lake Travis. Also discernable in the 1940 photograph is a portion of the path of the road now known
as Chipmonk, running from its intersection with Hurst Creek Road eastward to the cabin area. But
by the date of the next oldest aerial photograph, dated 1951, a number of additional roads are
discernable, including the continuations of Chipmonk southward from the cabin site and the roads
now known as Oak Hurst and Hurst View.

 A road is also visible running eastward from the general area in which the Hurst View
and Chipmonk routes intersected. This road continues into the vicinity of the Point's northern
boundary before curving northeastward following a route roughly parallel to the shoreline. Also
visible in the photograph is a circular road or path, which we will term the "lake access loop," that
branches southward off from the aforementioned road just before it makes its northeastward curve.
The loop descends into the area of the Point property, eventually running along the shoreline on the
eastern side toward the shore at the property's southeastern corner, then following the shoreline's
westward bend for a short distance before looping upward to intersect the other road again. As
confirmed by other evidence, including the testimony Mary Stewart Hicks, a granddaughter of A.K.
and Annie Stewart, the photograph demonstrated the existence of (1) a caliche or dirt road that ran
into and across the northern area of the Point before curving northward onto Emmet Stewart's
adjacent tract, and (2) another unpaved road--the lake-access loop--that reaches the Point's shore.

 In 1952, Annie Stewart died, leaving the undeveloped portions of the Graveyard Point
property, including the Point and Notch area, to her children. Her estate, through son Arthur as
executor, continued subdividing and selling residential lots from the remaining property. In 1961,
Arthur and the other heirs filed a plat for an "Annie Stewart Subdivision" encompassing most of
the remaining undeveloped land still owned by Annie's estate. The plat depicted both the property
being newly subdivided, which was identified as numbered lots, and several of the lots previously
conveyed, including those previously conveyed to appellees' predecessors, which were not numbered
but instead labeled with the names of their then-current owners. The plat did not depict or include
the Point and Notch area. The dedication "adopt[ed] the numbered tracts shown hereon, which are
part of the Annie Stewart Estate not heretofore disposed of, as a subdivision of such property . . . and
d[id] hereby grant a private easement over the roads, shown hereon, for use of the present and future
owners of the tracts abutting such roads, their heirs and assigns," reserving fee title in the roads to
the Annie Stewart estate. Soon thereafter, the subdivision lots were distributed among the heirs.
Contained in each of these deeds was the grant of an express easement "permitting ingress and egress
over existing roadways to the waters of Lake Travis."

 In 1962, the estate conveyed the tract that became known as the Notch--.16 acres of
the northernmost shoreline of what had previously been a single tract also encompassing the
Point--to Emmet Stewart, who was operating the marina on his adjacent tract to the north around
this time. This deed, similar to the deeds to the new Annie Stewart subdivision lots, contained an
express easement stating that "the grantee . . . his heirs and assigns, are hereby granted the privilege
of the use of the existing roadways leading to and from this property and to Lake Travis." There was
evidence that the only road leading toward the Notch was the caliche or dirt road across the northern
portion of the Point, although the road curved northeastward before reaching the Notch itself, and
that the lake-access loop over the Point ran alongside and near the Notch's western boundary before
reaching the shoreline south of the Notch.

 In 1965, the estate also conveyed, from land that had not been part of the
Annie Stewart Subdivision, the two remaining lots in the Johnstons' chain of title ("Offutt Nos. 2
and 3") to Douglas Offutt, the original grantee of the Johnstons' Offutt No. 1 lot in 1949, and who
in the meantime had also acquired the Sassman, Menn, and McClanahan lots in the Johnstons' chain
of title. Similar to the dedication in the subdivision plat and the express easement in the estate's
deed of the Notch to Emmet Stewart, the deed to the Offutt Nos. 2 and 3 lots granted an express
easement appurtenant providing "the right of ingress and egress to and from said property and to and
from the waters of Lake Travis over the existing roadways."

 A 1964 aerial photograph of Graveyard Point--the next oldest in evidence after
the 1951 photo--reflects the continued existence of the roads visible in the 1951 photo, as well
as the lake-access loop over the Point. The same is true of aerial photographs from 1973, 1980,
1988, and 1995.


Use of the Point and Notch 1940s-1990s

 Although Annie Stewart and later her estate had sold much of her and A.K.'s
Graveyard Point property by the mid-1960s, still remaining under her estate's ownership at the time,
and for several decades thereafter, was the Point, as well as some narrow strips of low-lying lakeside
property that were burdened by the direct lake-access easements that Annie and A.K. had granted
in their early conveyances. According to Mary Stewart Hicks, members of the Stewart extended
family had used the Point and Notch area for lake access and recreation "probably from the time
I was a baby" in the early 1940s. (3) Hicks elaborated that the family used the property as "our access
to the water" and for picnicking, fishing, and "just walking down there and looking around,
whatever." She described the frequency of the family's use of the property as "20 years definitely
we used it. After that, off an[d] on."

 There was also evidence that during the years in which the Emmet Stewart marina
was operating, the Point and Notch served as a parking area for patrons. But following the marina's
demise, according to a longtime Graveyard Point resident, Theodore Staub, the Point and Notch area
became overgrown and had come to resemble a "community dump" by the 2000s. 

 Whatever the property's aesthetic appeal might have been, there was evidence that
beginning in the early 1950s, and continuing for decades thereafter, some third parties who owned
property on Graveyard Point, including some of appellants' predecessors in title, used the Point
and Notch as their primary access route to Lake Travis. These individuals would drive or walk from
their lots on the road now known as Oak Hurst eastward over the road now known as Hurst View,
continue a short distance southward on the road now known as Chipmonk to reach a road that ran
eastward toward the Point, later known as Hurst Creek Circle. The route of Hurst Creek Circle, in
turn, eventually continued into the previously described caliche or dirt road that ran across the
northern portion of the Point. Once at the Point, the evidence reflected that these individuals would
park on the Point or Notch, traverse these properties via the lake-access loop or otherwise to
reach the lake waters, picnic or engage in other recreational activities on the shoreline, and even
maintain boats and boat docks there. In addition to witness accounts, evidence of such historical
uses included several sets of family photographs depicting property owners and their guests boating,
swimming, and engaging in other recreational activities at the Point or Notch, or on or around boat
docks offshore. Likewise, the aerial photographs from 1964, 1973, 1980, 1988, and 1995 each show
one or more boat docks moored off of the Point or Notch. 

 Appellants ultimately stipulated to several facts regarding the manner in which
appellees' predecessors accessed and used the Point and Notch:


 "[Appellees'] predecessors in title, Offutt [a predecessor to the Johnstons, as previously
indicated] and Peterson [as explained below, the immediate predecessor to the Gays] used
Hurst View and [appellants'] properties and maintained boat docks and boats at [appellants']
properties during the time they owned [appellees'] tracts."

 "Mr. Peterson used Hurst View and [appellants'] properties to access Lake Travis and
maintained a boat dock and boat at the properties [appellants] consider the Point from at least
1991 through 1999 when he sold the property to the Gays."

 "Mr. Offutt used Hurst View and [appellants'] properties to access Lake Travis and
maintained a boat dock and boat at the properties [appellants] consider the Point from at least
1958 through 1985."

 "The Rogers [who would later acquire the Sassman, Offutt No. 1, and Menn lots from an
Offutt heir following Offutt's death, and who would convey the lots to the Johnstons in
June 2001] used Hurst View and [appellants'] properties to access Lake Travis during the
time they owned the Johnstons' tracts."




While acknowledging that these third-party uses of the Point and Notch area dated back to at least
the 1950s, Mary Stewart Hicks insisted that they began with a grant of permission from her uncle
Arthur Stewart, the executor of Annie Stewart's estate. She indicated that, in fact, the lake-access
loop or a portion of it had been construed thereafter by "the people that used our property," an
endeavor that, she added, had entailed moving large rocks and clearing holes in a line of trees.
However, when confronted with the 1951 aerial photograph during cross-examination, Hicks
acknowledged that the entire lake-access loop was already visible by that time--a time at which
Annie was still alive and still owned the Point and Notch.


Appellees use the Point and Notch, too

 Beginning as early as the mid-1980s through the following decade, the Gays, although
not yet themselves owners of Graveyard Point realty, had maintained a boat and smaller children's
watercraft as guests on a floating dock owned by Tim Arnold, who owned a residential lot on
Hurst View. Arnold, according to Stephen Gay, kept his dock attached to the Point or Notch, and
Stephen estimated that three or four other dock owners did the same during this period. In evidence
were several photographs of the Gays and their children sailing, swimming, and enjoying other
recreational activities on the dock and in the waters nearby.

 In 1999, the Gays purchased their three lots on Oak Hurst from the
Bob Peterson family, who had owned them since the early 1990s. With the realty--which included
what Stephen Gay described as a "little cubby 1950s fishing cabin"--the Petersons also conveyed
a boat dock and boat that they had originally acquired from their lots' prior owner. According to
Stephen Gay, this boat dock had been moored at the Point and Notch for as long as he had
been visiting there.

 The Johnstons purchased the Sassman, Offutt No. 1, and Menn lots from the Rosses
in June 2001. According to Steven Johnston, his family had owned a motorboat, enjoyed skiing and
other recreational activities on the water, and had deliberately sought out residential property with
access to Lake Travis. Initially, however, the Johnstons did not own or maintain a boat dock at the
Point or Notch, nor is there any indication that the Rosses did during the years they owned the lots. Following their respective purchases of lots on Oak Hurst, there is no dispute that
both the Gays and Johnstons, like their predecessors, traveled over Hurst View, Chipmonk, and
Hurst Creek Circle to the Point, walked or drove over the lake-access loop, parked on and traversed
the Point or Notch, and engaged in recreational use of the properties. These uses included the
Gays' continued use of the boat dock they had acquired from the Petersons, along with watercraft
they kept there.


 However, in September 2001, an attorney acting on behalf of the Stewart heirs
contacted both the Gays and Johnstons demanding that they remove any boats and docks from the
Point and Notch and requesting proof of any rights they had to use the properties. A fence with a
gate and "No Trespassing" sign was erected blocking the road to the Point. In response, the Gays
and Johnstons each provided the heirs' attorney copies of express easements in their respective
chains of title, expressing the view that these instruments granted them the right to access and use
the property as they previously had. The fence was removed, and appellees heard no more on the
matter from the heirs or their attorney for several months. Professing the belief that the absence of
a response confirmed the validity of their easement claim, in early 2002 the Johnstons purchased a
boat dock as well as a fishing boat, and moored the dock with their boats at the Point. Subsequently,
in May 2002, the Johnstons acquired the McClanahan lot from Michael and Tracy Good, who had
acquired it from heirs of Douglas Offutt. Similarly, the Gays claimed that some of the Stewart heirs
had assured them that the Gays could continue crossing the property and using their dock and boats,
and explained that their family was merely seeking to restrict access to their property by persons
unauthorized to be there.

 However, during the latter half of 2002, the Stewart heirs' attorney left notices on
the Gays' and Johnstons' docks ordering that the docks and boats be removed. Again, the couples
provided the attorney copies of their deeds and heard nothing further thereafter from the heirs or their
attorney. Thereafter, the Gays and Johnstons continued accessing and using the Point and Notch
as before. Furthermore, the Gays would also purchase a new boat and dock thereafter, and the
Johnstons would purchase additional lots--the Offutt Nos. 2 and 3 lots in 2001 and 2002 and, in
2006, the Dolan lot from the Kimbriels.

Appellants come to the neighborhood

 Meanwhile, in 1997, appellee Desmond had purchased acreage on the northern tip
of Graveyard Point that had been part of one of the tracts that Annie Stewart had gifted to her
children in 1949. The original grantee of this tract, son Ernest Stewart, had subsequently subdivided
the tract's interior into residential lots while retaining the portion of the tract lying between those lots
and the lake. Somewhat similar to his parents' earliest conveyances on Graveyard Point, Ernest
granted the lot purchasers express easements allowing ingress and egress to the lake over his
intervening property down to the 670 m.s.l. contour. The property that Desmond acquired in 1997
included one of the residential lots and, subject to the aforementioned easements, Ernest's former
shoreline property.

 Desmond and Davis began conducting Aqua Tech's business operations at the site,
constructing boat docks. This prompted owners of the neighboring residential lots to initiate what
the parties have termed the "Mabry" litigation against Desmond, Davis, and Aqua Tech (i.e., the
same parties who are now appellants here). (4) The Mabry plaintiffs sought declaratory and injunctive
relief to restrain alleged interference with their express easement rights and to enforce an express
restrictive covenant barring commercial use of Desmond's residential lot. Additionally, although
no express restrictive covenant barred commercial use of the shoreline property, the plaintiffs
asserted that this property was nonetheless subject to a negative implied restrictive covenant barring
such use. Following a bench trial, the district court rendered judgment in favor of the plaintiffs and,
in part, barred appellants from using either the residential lot or shoreline property for commercial
use. Appellants filed a notice of appeal from the Mabry judgment, but this Court would ultimately
dismiss their appeal for want of prosecution in January 2005. (5)

 Instead, appellants responded to the Mabry judgment chiefly by attempting to relocate
Aqua Tech's operations to a different location on Graveyard Point where there were no legal
restrictions against them. It happened that around the same time, the Annie Stewart heirs, through
Mary Stewart Hicks, were attempting to sell the Point and some narrow strips of property near the
670 m.s.l. contour that ran along the peninsula's shore to the south. Although A.K., Annie, or her
estate had typically imposed express restrictive covenants on the residential lots they had developed
on Graveyard Point, no such restrictions had ever been applied to the Point. (The same was also true
of the Notch). In 2004, Davis began leasing the Point property from the Stewart heirs through Hicks. 
In January 2005--and on the same date on which appellants' appeal in Mabry was dismissed--Davis
purchased the Point from the heirs, with the lakeside strips of property thrown in, via a deed without
warranties. The deed did not contain any express provision barring commercial use of the property.

 Prior to the conveyance, a survey of the property was prepared by a George Sanders,
who would later testify on appellants' behalf at trial. A copy of relevant portions of Sanders's survey
appears in Appendix C, which was admitted into evidence at trial. The survey reflected the ongoing
existence of the road through the northern portion of the Point--in the form of an "asphalt drive"
that extended from Hurst Creek Circle eastward from that street's intersection with Graveyard Point
Road, then became a "dirt drive" before curving northeastward onto the adjacent property--and a
"dirt path" corresponding roughly to the route of the lake-access loop.


The dispute

 Although there was evidence that Davis and appellees initially attempted to be
somewhat accommodating to one another--for example, appellees acceded to a request from
Davis that they relocate their docks along the Point shoreline to make room for Aqua Tech's
operations--Davis ultimately began requesting, and later demanding, that appellees pay him rentals
if they wished to use his property. By late 2005, matters escalated to the point that appellees accused
Davis and Desmond of threatening behavior, of making petty or vexatious complaints to authorities,
and of twice cutting cables attaching their boats and docks to the land and allowing them to float
dangerously around Lake Travis.

 On February 2, 2006, appellees sued appellants seeking declaratory, injunctive, and
monetary relief predicated on allegations that appellees each owned easements permitting them to
access and use the Point for recreation, including maintaining docks and boats there, and that
a negative implied restrictive covenant barred commercial activity on the property. (6) Insisting that
appellees had no rights in the property and that there were no applicable restrictions against
commercial use, appellants countered with their own claims for declaratory, injunctive, and monetary
relief to remedy alleged slander of title, trespass, and nuisance, and to quiet title. Appellees obtained
a temporary restraining order prohibiting Davis and Desmond from damaging or interfering with the
Gays' and Johnstons' personal property or ability to access the roadway on the Point, although the
court denied appellees' request to enjoin commercial use of the properties.

 Later that year, while the lawsuit was still pending, Desmond acquired the Notch
property. The district court would later find that Desmond, ostensibly under color of a claim that
she was not bound by the TRO because she owned a property other than the Point, continued efforts
to obstruct appellees' access and use of the properties.

 The parties' claims were tried to the bench, which heard evidence over the course
of four days. Following trial, the district court rendered judgment declaring that appellees owned
easements appurtenant to each of their lots granting them "[t]he right to unobstructed use of the
roadway connecting Oak Hurst Road with the Davis Parcel" (i.e., proceeding over Hurst View, down
Chipmonk to Hurst Creek Circle, and eastward over Hurst Creek Circle to the entrance to the Point)
"by foot, bicycle, and/or by vehicle," as well as the following easements granting the right to use the
Point and Notch themselves: 


Roadway on the Davis Tract:

The right to the unobstructed use of The Roadway on the Davis Tract [defined to
include both the road over the northern portion of the Point, as well as a route
tracking the lake access loop] for the purposes of ingress and egress to and from the
waters of Lake Travis and its shore areas, including the right of passage over, upon,
and across such roadway by foot, bicycle, and by vehicle. The right to use The
Roadway on the Davis Tract includes the right to remove obstructions, including
trimming overhanging branches of trees. It also includes the right, but not the
obligation, to repair, pave, grade, or maintain the roadway, or generally to perform
any act necessary to render The Roadway on the Davis Tract suitable for passage. 
It includes the right to place and to maintain survey markers showing the location and
limits of The Roadway on the Davis Tract.





From Roadway to Waters of Lake Travis:

The right of unobstructed passage over, upon, and across the Davis Tract and/or the
Desmond Tract by foot, bicycle, or by vehicle from The Roadway on the Davis Tract
to the waters of Lake Travis, at whatever level they may be.


Boat Docks:

The right to maintain and use a boat dock, its anchors, cables, associated walkways,
and other appurtenances, and boats, and/or other recreational floatation devices, on
or over those portions of the Davis Tract and/or the Desmond Tract subject to
inundation by the waters of Lake Travis, whether floating or resting on the Shore of
Lake Travis.


Recreation: 

The right to linger within and to use for all recreational purposes those portions of
the Davis Tract and the Desmond Tract (a) lying within the Roadway on the Davis
Tract, (b) lying within the Shore of Lake Travis, or (c) inundated by the waters of
Lake Travis.



The district court also declared that a "negative implied restrictive covenant" prohibited use of the
Point or Notch for commercial purposes.

 In addition to the foregoing declaratory relief, the judgment also permanently enjoined
Davis and Desmond "from ever doing any and all of the following":


1. Taking any action that interferes with or obstructs Plaintiffs from using their
easement rights as declared herein.


2. Operating any commercial enterprise whatsoever at the Davis Tract or the
Desmond Tract.


3. Taking any action that obstructs and/or interferes with Plaintiffs' or
Plaintiffs' invitees' recreational use and enjoyment of Lake Travis or restricts
their engaging in reasonable recreational uses of the Roadway on the Davis
Tract, the Davis Tract or the Desmond Tract.


4 Blocking or obstructing in any way Plaintiffs' or Plaintiffs' invitees'
vehicular and/or pedestrian access to the Roadway on the Davis Tract and/or
the Desmond Tract, Hurst View Road and/or the Roadway to the Davis
Parcel as defined above.

5. Altering the land at the Davis Tract or the Desmond Tract in any way that is
inconsistent with Plaintiffs' easement rights.


6. Altering the location of the Roadway on the Davis Tract unless by written
agreement of Plaintiffs and Defendants.


7. Taking any action that creates a hazard on the Davis Tract or the Desmond
Tract[.]


8 Taking any action that creates a hazard in the waters surrounding Plaintiffs'
boat docks, boats, and/or other floatation devices.


9. Touching or doing any damage to Plaintiffs' boat docks, boats, anchors,
and/or other personal property or directing others to do so.


10. Taking any action that threatens or harasses Plaintiffs or their invitees.



Finally, the district court rendered judgment that appellants should take nothing on their
counterclaims and awarded attorney's fees to appellees as permitted by the Uniform Declaratory
Judgments Act. (7)

 The district court subsequently made findings of fact and conclusions of law. Among
other holdings, the court concluded that appellees' positive easement permitting use of the Point and
Notch existed by express grant in appellees' deeds, as well as theories of estoppel, implication, and
prescription.

 This appeal ensued.


ANALYSIS

 Appellants bring seven issues on appeal. The first five challenge the district court's
judgment declaring that appellees own the above-described positive easements to use the Point and
Notch for recreational purposes. Specifically, in their first issue, appellants challenge the legal and
factual sufficiency of the evidence underlying the district court's legal conclusions that appellees
hold express easements that burden the Point or Notch. In their second issue, appellants urge that
the district court erred in holding that the express easements in appellees respective chains of title,
which purport to grant no more than a right of "ingress and egress" to and from Lake Travis,
confer the rights to maintain boats and boat docks and engage in the other recreational uses it
declared in the judgment. In their third, fourth, and fifth issues, appellants challenge the legal and
factual sufficiency of the evidence underlying the district court's legal conclusions that the positive
easements existed under theories of, respectively, estoppel, implication, or prescription.

 In their sixth issue, appellants attack the district court's judgment that a
"negative implied restrictive covenant" bars commercial use of the Point and Notch. Finally, in their
seventh issue, appellants urge that to the extent we sustain their other issues, we should reverse the
district court's judgment, render judgment for them on their declaratory-judgment counterclaims,
and remand their accompanying counterclaim for attorney's fees for reconsideration in light of the
change in prevailing parties.


Standard of review

 Each of the appellants' issues on appeal turns at least in part on whether the evidence
is legally or factually sufficient to support the district court's judgment. In an appeal from a
judgment rendered after a bench trial, the trial court's findings of fact serve the same function as
the verdict of a jury. See Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994). When a party is
challenging the legal sufficiency of the evidence supporting an adverse finding on an issue on which
an opposing party has the burden of proof, it prevails if the record shows any one of the following:
(1) there is no evidence supporting a vital fact, (2) the evidence offered to prove a vital fact is no
more than a mere scintilla, (3) the evidence conclusively establishes the opposite of the vital fact,
or (4) the court is barred by law or the rules of evidence from considering the only evidence offered
to prove the vital fact. See City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex. 2005). More than
a scintilla of evidence exists when the evidence supporting the finding, as a whole, "rises to a
level that would enable reasonable and fair-minded people to differ in their conclusions." Merrell
Dow Pharms. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997); Transportation Ins. Co. v. Moriel,
879 S.W.2d 10, 25 (Tex. 1994). If the evidence is so weak as to do no more than create a
mere surmise or suspicion of its existence, its legal effect is that it is no evidence. Haynes & Boone
v. Bowser Bouldin, Ltd., 896 S.W.2d 179, 182 (Tex. 1995). Conversely, evidence conclusively
establishes a vital fact when the evidence is such that reasonable people could not disagree in their
conclusions. See City of Keller, 168 S.W.3d at 814-17.

 When addressing a legal-sufficiency challenge, we are to view the evidence in the
light most favorable to the district court's findings, "crediting favorable evidence if reasonable jurors
could, and disregarding contrary evidence unless reasonable jurors could not." Id. at 807. Moreover,
we must indulge every reasonable inference that would support the district court's findings. Id.
at 822. The ultimate test for legal sufficiency is whether the evidence at trial would enable
reasonable and fair-minded people to reach the verdict under review. See id. at 827.

 When a party challenges the factual sufficiency of the evidence supporting an adverse
finding on which the opposing party had the burden of proof, we should set aside the finding only
if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. See
Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We must consider, weigh, and examine all of the
evidence in the record, both supporting and against the finding, to decide whether the finding should
be set aside. See Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex. 1989); Pool v. Ford
Motor Co., 715 S.W.2d 629, 635 (Tex. 1986).


Express grant?

 In support of its judgment declaring that appellees owned the aforesaid positive
easements permitting their recreational use of the Point and Notch, the district court made legal
conclusions that Annie Stewart, or her estate, had expressly granted those very easements when
initially conveying every one of appellees' lots to its original grantee. Underlying these conclusions,
however, were somewhat narrower findings (or, in substance, conclusions) that centered primarily
on the meaning and application of the specific easement language Annie used in her May 1945 deeds
to the Gays' Frazer lot and the Johnstons' Sassman and Dolan lots. In these deeds, as previously
noted, Annie had granted an easement appurtenant permitting use of "the roadway now open on the
Northeast of the land herein conveyed" (in the Frazer deed) and "the roadway now open on the East
of the land herein conveyed" (in the Sassman and Dolan deeds) "for the purpose of ingress and
egress to Lake Travis." With evident reference to this language, the district court found or concluded
that "[a]t the time of the conveyances, the roadway now open to the East of the Sassman Parcel, the
Dolan Parcel . . . and Northeast of the Frazer Parcel providing ingress and egress to the public waters
of Lake Travis is the roadway now known collectively as Hurst View, the roadway to the Point (the
Davis tract) and the roadway on the Point." (8) In other words, the district court held that "the roadway
now open" contemplated by these 1945 express easements corresponded precisely to the route of the
easement declared in the district court's judgment. Rejecting alternative theories advanced by
appellants at trial, the district court further found or concluded that "[t]he roadway located East of
the Johnston Tracts and Northeast of the Gay Tracts" was not any of the roadways later named Oak
Hurst, Hurst Creek Road, Blue Cat Lane, or Chipmonk Road. The district court also made findings
tracking the language of the easement in the 1965 deed to the Offutt Nos. 2 and 3 lots now owned
by the Johnstons.

 As for the scope of appellees' easements, the district court found or concluded that
the easements were "unqualified" and permitted not only "ingress and egress to the waters of
Lake Travis," but also the "recreational activities in the waters of Lake Travis and on the Shore of
Lake Travis, as the Court declared in its Final Judgment."

 In their first issue, appellants assert that the district court made two chief errors in
finding or concluding that these express easements burdened the Point and Notch. First, appellants
urge that the district court misconstrued or ignored the easements' directional language. They insist
that the unambiguous language, applied to conclusive evidence of the geographic relationship
between the relevant lots and roads, compels the conclusion that the road now known as Oak Hurst,
not the easement route declared by the district court, was the sole "roadway now open on the
Northeast" of the Frazer lot and "on the East" of the Sassman and Dolan lots. Second, appellants
maintain that the court's construction was not viable in any event because the evidence was legally
and factually insufficient to establish that the first portion of the "roadway" and easement route it
declared--the road now known as Hurst View--was "now open" as of the dates of the relevant
conveyances. In their second issue, appellants urge that even if the district court correctly
determined the easements' location, it misconstrued the scope of uses authorized in the instruments
and awarded appellees rights far exceeding "ingress and egress to Lake Travis."

 An easement is a nonpossessory interest in land that authorizes its holder to use
the property for specified purposes only. Marcus Cable Assocs., L.P. v. Krohn, 90 S.W.3d 697, 700
(Tex. 2002) (citing Restatement (Third) of Property (Servitudes) § 1.2 cmt. d (2000)). Nothing
passes by implication "except what is reasonably necessary" to fairly enjoy the rights expressly
granted. Coleman v. Forister, 514 S.W.2d 899, 903 (Tex. 1974). Use of the easement to pursue a
purpose not provided for in the grant is not permitted. Marcus Cable, 90 S.W.3d at 701; Coleman,
514 S.W.2d at 903.

 An easement's express terms, interpreted according to their generally accepted
meaning, delineate the purposes for which the easement holder may use the property. Marcus Cable,
90 S.W.3d at 701 (citing DeWitt Cnty. Elec. Coop., Inc. v. Parks, 1 S.W.3d 96, 103 (Tex. 1999)).
We apply basic principles of contract construction and interpretation. See DeWitt, 1 S.W.3d at 100. 
Construction of an unambiguous contract presents a question of law that we review de novo. See
State v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006); City of El Paso v. Public Util. Comm'n,
344 S.W.3d 609, 619 (Tex. App.--Austin 2011, no pet.). Under these principles, our primary
concern is to ascertain the true intentions of the parties as expressed in the instrument. See Valence
Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005). Ordinarily this is a function of the text
the parties have chosen because it is the objective, not subjective, intent that controls. Matagorda
Cnty. Hosp. Dist. v. Burwell, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam); see Harbor Ventures,
Inc., 2012 WL 1810205, at *17. When the easement's terms are not specifically defined, they are
given their plain, ordinary, and generally accepted meaning. See Marcus Cable, 90 S.W.3d at 702;
see also Restatement (Third) of Property (Servitudes) § 4.1 cmt. d ("[Easement] language should be
interpreted to accord with the meaning an ordinary purchaser would ascribe to it in the context of
the parcels of land involved. Searching for a particular meaning adopted by the creating parties is
generally inappropriate because the creating parties intended to bind and benefit successors for
whom the written record will provide the primary evidence of the servitude's meaning."). Adhering
to an easement's express terms serves important public policies by promoting certainty in land
transactions and allowing potential purchasers to safely rely upon granting language. Marcus Cable,
90 S.W.3d at 702. "Similarly, those who grant easements should be assured that their conveyances
will not be construed to undermine private-property rights--like the rights to 'exclude others' or
to 'obtain a profit'--any more than what was intended in the grant." Id.; see id. at 700 ("A property
owner's right to exclude others from his or her property is recognized as 'one of the most essential
sticks in the bundle of rights that are commonly characterized as property.'" (quoting Dolan
v. City of Tigard, 512 U.S. 374, 384 (1994) (quoting Kaiser Aetna v. United States, 444 U.S. 164,
176 (1979))).

 As with contract construction generally, evidence of the context and circumstances
surrounding the execution of an express easement may in some instances be relevant in determining
the meaning of the words the parties have chosen. See Houston Exploration Co. v. Wellington
Underwriting Agencies, Ltd., 352 S.W.3d 462, 469 (Tex. 2011) (noting that, subject to parol
evidence rule, court may consider surrounding circumstances that inform the meaning of contract
text); Marcus Cable, 90 S.W.3d at 701 (acknowledging that "the circumstances surrounding the
creation of the servitude" may inform the easement's meaning) (quoting Restatement (Third) of
Property (Servitudes) § 4.1; Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d
587, 589 (Tex. 1996); see also Harbor Ventures, 2012 WL 1810205, at *8 ("We construe contracts
from a utilitarian standpoint, bearing in mind the particular activity sought to be served.") (citing
Frost Nat'l Bank v. L & F Distribs., Ltd., 165 S.W.3d 310, 312 (Tex. 2005)). But only if the
words the parties used, considered in context, are susceptible to more than one reasonable
construction--i.e., ambiguous--may we look to extrinsic evidence of the parties' subjective intent.
See City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex. 1968) ("It is
the general rule of the law of contracts that where an unambiguous writing has been entered
into between the parties, the Courts will give effect to the intention of the parties as expressed or
as is apparent in the writing. In the usual case, the instrument alone will be deemed to express
the intention of the parties for it is objective, not subjective, intent that controls."); see also
J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003) (noting that if court can give
contract definite or certain legal meaning, it is unambiguous and court must construe it as a matter
of law). The threshold question of whether an easement is ambiguous or not, as with questions of
contract construction generally, is a question of law. See City of El Paso, 344 S.W.3d at 619 (citing
J.M. Davidson, 128 S.W.3d at 229).


 Scope of easements

 We begin with appellants' second issue, concerning the scope of the express
easements at issue, because our resolution of it is both straightforward and ultimately helpful in
informing our analysis of appellants' first issue. To the extent any of the easements appellees own
purports to grant any right of access to Lake Travis, they explicitly afford only a right to "ingress
and egress." It happens that this Court very recently had occasion to construe a materially identical
easement in one of A.K. and Annie Stewart's 1944 deeds to lots on the north side of present-day
Oak Hurst. See Harbor Ventures, 2012 WL 1810205, at *1. In Harbor Ventures, we held that
"ingress and egress . . . to Lake Travis" unambiguously denotes only those activities reasonably
necessary to come and go to the stated destination, and did not confer rights to install boat docks or
engage in other broader "recreational purposes." Id. at *11. In so doing, we relied on an established
line of precedents--including several of our own--for the proposition that rights of "ingress and
egress" do not "impliedly grant the right to use the property for general recreational purposes
'normally associated with the use and enjoyment of lakefront property.'" See id. (citing Coleman,
514 S.W.2d at 903 (easement for "ingress and egress" does not grant "right to linger for recreational
purposes, or to exercise waterfront privileges"); Cummins v. Travis Cnty. Water Control &
Improvement Dist. No. 17, 175 S.W.3d 34, 52 (Tex. App.--Austin 2005, pet. denied) (mooring boat
dock on land over which one has easement for purposes of ingress and egress to lake not reasonably
necessary to achieve rights expressly granted); Lakeside Launches, Inc. v. Austin Yacht Club, Inc.,
750 S.W.2d 868, 869 (Tex. App.--Austin 1988, writ denied) (easement for purpose of ingress and
egress does not convey right to anchor and float commercial boat dock); Wall v. Lower Colo. River
Auth., 536 S.W.2d 688, 691 (Tex. Civ. App.--Austin 1976, writ ref'd n.r.e.) (right of ingress and
egress across land retained by grantor does not grant implied right to build or maintain structures
appropriate to lakefront property)).

 Relying on this same line of authority, we sustain appellants' second issue. We hold
that the express easements granted in appellees' chains of title, wherever they might be located
and whatever property they burden, afford appellees only the right to engage in activities
reasonably necessary to serve the purpose of coming and going to and from Lake Travis--not, as the
district court held, the right to maintain boats or docks, or engage in the array of other recreational
activities it identified.


 Location of the Gays' easement

 We now turn to the district court's findings and conclusions concerning
whether appellees' ingress-egress easements burden the Point and Notch. It is helpful to consider
the easements in the Gays' versus the Johnstons' chains of title separately.

 Under the unambiguous text of the easement granted in the Frazer deed, each of the
following must be true of the easement's location or route: 



 The route must have been "open" as of May 29, 1945, the date of the Frazer deed.

 As of that date, the route must have been a singular "roadway" within the meaning of the
easement. As appellees have emphasized throughout this litigation, the phrase "the roadway
now open. . ." denotes a single roadway rather than a series of different roads or segments
of roads.

 the route or "roadway" must be "on the Northeast of the land herein conveyed," the
Frazer lot.




(Emphasis added.) The third requirement is dispositive.

 The ordinary meaning of the preposition "on," within the phrase "on the Northeast
of the land herein conveyed," denotes that, at a minimum, the "roadway" must be located in a
northeasterly direction from or relative to the Frazer lot. (9) Also, as appellants further emphasize, "on"
is often used to denote abutting or adjacent land. (10) Under either meaning, the easement route
declared by the district court, which begins at present-day Hurst View and continues eastward
onto the Point, cannot, as a matter of law, be considered "on the Northeast" of the Frazer lot. As
demonstrated in Appendices A and B, the court's easement route instead begins at a point to the
southeast of the Frazer lot. Nor is the route abutting or adjacent to the Frazer lot, but is instead
separated from it by the width of Oak Hurst and a portion of the Dolan lot. And, as Appendix A
also shows, the only "roadway . . . on the Northeast" of the Frazer lot, under either definition, is
Oak Hurst.


 The Gays have not seriously disputed that, geographically speaking, the court's
easement route is not "on the Northeast" of the Frazer lot. They have likewise acknowledged that
the road now known as Oak Hurst was "now open" as of May 1945 and that, all other things
being equal, that road would have fit the description of a "roadway now open on the Northeast"
of the Frazer lot. Nonetheless, the Gays successfully persuaded the district court to disregard the
easement's literal text in the view that (1) the easement was explicitly intended "for the purpose of
ingress and egress to Lake Travis," and (2) an easement over Oak Hurst would thwart, rather than
achieve, this purpose because this "roadway" did not in itself reach Lake Travis, but ran in an
inverted "U" shape within the interior of the Graveyard Point peninsula. (11) The Gays also advanced
a broader theory that the Stewarts collectively intended to pursue a common development "plan or
scheme" in which lot owners were to have broad rights to access and enjoy the lake, and to that end
reserved the Point and Notch for the use of owners who, like appellees, lacked lakeside frontage. 
The district court made several findings to this effect. Neither theory is a valid basis for deviating
from the text that Annie Stewart actually used.

 It is true that our reliance on the plain meaning of contractual text must in some
instances be qualified when that construction would yield a result that the parties manifestly
could not have intended. See Lane v. Travelers Indem. Co., 391 S.W.2d 399, 402 (Tex. 1965)
(refusing to construe contract in manner that would lead to absurd results); Avasthi & Assocs., Inc.
v. Banik, 343 S.W.3d 260, 264 (Tex. App.--Houston [14th Dist.] 2011, pet. denied) (declining to
accept construction of contract that would produce absurd results because there was construction that
would not produce absurd result); see also Harbor Ventures, 2012 WL 1810205, at * 8 (contracts
are construed with an eye to the "particular activity sought to be served") (citing Frost Nat'l Bank,
165 S.W.3d at 312). That is the essence of the Gays' arguments regarding Oak Hurst and their
emphasis on the fact that the street does not, in itself, reach Lake Travis. Appellants concede that
Oak Hurst does not itself reach Lake Travis. However, this does not mean, as the Gays suggest, that
an easement over Oak Hurst would fail to effectuate Annie Stewart's manifest "purpose of ingress
and egress to Lake Travis."

 As demonstrated by undisputed and conclusive evidence that includes Appendix A,
aerial photographs, and testimony, the road now known as Oak Hurst terminates at its western end
at Hurst Creek Road, which runs in a roughly north-south direction along what is now the western
side of the Graveyard Point peninsula. It is likewise undisputed that Hurst Creek Road predates
the construction of Mansfield Dam and has been a public road at all relevant times. The dam's
construction caused the northern portions of Hurst Creek Road to be inundated off of what became
the northwestern shore of Graveyard Point, leaving the remaining portions of the road leading from
the Oak Hurst terminus as a means of access to the lake waters. Consequently, the owner of the
Frazer lot could have accessed the lake by traveling from the lot westward on Oak Hurst to
its terminus at Hurst Creek Road, then northward to the shore. While appellees insist that this
arrangement would have been inconsistent with the easement's reference to a singular "roadway,"
only an easement over the Oak Hurst portion of the route was necessary to secure "the purpose of
ingress and egress to Lake Travis"--once a lot owner traversed the still-private, Stewart-owned
Oak Hurst to the road's western end, he or she could travel over a public roadway, which required
no easement to use, to reach the lake waters.

 That an easement over Oak Hurst would satisfy the parties' manifest "purpose of
ingress and egress to Lake Travis" is further demonstrated by considering, again, the nature and
scope of the "ingress and egress" right that Annie Stewart granted. As we held above, it is merely
a right to pass to and from Lake Travis and engage in a limited range of activities reasonably related
thereto--not, as the Gays have assumed, and the district court held, a right to engage in a broader
range of recreational activities on the lake's shore and in the adjacent waters. This limited right
would be effectuated by an easement to traverse the private road of Oak Hurst in order to reach a
public road leading to the lake waters.

 In short, this is not a case where our plain-meaning construction of easement language
yields a result that the parties could not have intended. See Lane, 391 S.W.2d at 402; Avasthi,
343 S.W.3d at 264. As for the Gays' broader "common plan or scheme of development" theory, it
amounts to an invitation to improperly consider extrinsic or parol evidence of the parties'
intent in derogation of the unambiguous text they actually used. See Sun Oil Co. (Del.) v. Madeley,
626 S.W.2d 726, 731 (Tex. 1981) ("'It is the general rule of law of contracts that where an
unambiguous writing has been entered into between the parties, the courts will give effect to the
intention of the parties as expressed or as is apparent in the writing. In the usual case, the instrument
alone will be deemed to express the intention of the parties for it is objective, not subjective, intent
that controls.'" (quoting City of Pinehurst, 432 S.W.2d at 518)). In any event, we observe that
appellees' evidence of this supposed "plan or scheme" actually tends to undermine, rather than
support, any notion of a common plan in which interior lot owners on Oak Hurst were given access
to the lake via the Point and Notch.

 In support of this and other theories at trial, appellees presented considerable evidence
regarding the history of the development of A.K. and Annie Stewart's Graveyard Point property
by the couple and Annie's heirs. This evidence included a summary of abstract prepared by
Kent McMillian, a surveyor, reflecting dozens of conveyances by the couple and Annie's estate,
lake-access and road easements they granted, and any express restrictions imposed against
commercial use of the properties being conveyed. The summary reflects that in June 1945, within
a month after executing the Frazer, Sassman, and Dolan deeds, Annie executed the Dyer deed and
granted an express easement identical to those in the three prior deeds except for the directional
language--it granted a right of "ingress and egress to Lake Travis" over "the roadway now open to
the North of the land herein conveyed." As Appendices A and B demonstrate, the easement route
declared by the district court cannot conceivably be considered a "roadway to the North of the
land herein conveyed" of the Dyer lot. Only the road now known as Oak Hurst would fit that
description. The same is also true of a 1951 Annie Stewart conveyance of a lot on Oak Hurst located
near the street's western terminus with Hurst Creek Road, the Monaghan lot--she granted an
easement over "the roadway now open on the West of the land herein conveyed . . . for the purpose
of ingress and egress to Lake Travis." Again, the road now known as Oak Hurst lay "on the West"
of this lot, and the easement route declared by the district court was situated in completely the
opposite direction. In short, if there is a "common plan or scheme" of development suggested by
this evidence, it is that Annie Stewart consistently intended that the owners of interior lots along the
road now known as Oak Hurst would have easements permitting them to access Lake Travis via
Oak Hurst and then Hurst Creek Road.

 Giving effect to the plain and ordinary meaning of the easement, we hold that the
evidence shows conclusively that "the road now open on the Northeast of the land herein conveyed"
in the Frazer deed refers to the road that is, in fact, "on the Northeast" of that lot--the road
now known as Oak Hurst, not the easement route that the district court declared. See Marcus Cable,
90 S.W.3d at 702. In other words, the Gays own no express easement granting them a right to use
the Point or Notch. We sustain appellants' first issue with respect to the Gays. (12)


 Location of the Johnstons' easements

 We now consider whether the district court erred in holding that any of the easements
in the Johnstons' chain of title burden the Point or Notch. Given that the text of the Sassman and
Dolan easements are parallel to the easement granted in the Frazer deed, differing only with respect
to the directional reference, the parties have relied largely on the same arguments, evidence, and
findings with respect to all three. And given the similarities between these two sets of easements
(not to mention also the Dyer and Monaghan easements), our above analysis concerning the
Frazer easement would arguably apply to the Sassman and Dolan easements as well--"the roadway
now open on the East of the land herein conveyed" in the Sassman or Dolan easements would,
in the same way, refer to the road now known as Oak Hurst and not the easement route declared
in the judgment.

 On the other hand, if one considers the Sassman or Dolan easement independently
from the foregoing analysis, the meaning and application of the directional language becomes less
clear. Unlike the situation with the Frazer deed, application of the directional language reveals a
potential ambiguity--not only Oak Hurst but Hurst View and the remainder of the court's easement 

route could reasonably be said to be "on the East" of the Sassman and Dolan lots. However, this
potential ambiguity would exist only if the road now known as Hurst View had in fact been opened
by the time of the Sassman and Dolan conveyances in May 1945. Consequently, that issue becomes
of paramount importance with respect to the Johnstons' rights, and the parties devote much of their
appellate briefing to disputing whether or not sufficient evidence supports the district court's
findings that Hurst View had been opened by May 1945.

 We need not reach these contentions, however, because our review of the
district court's findings of fact and conclusions of law reveals that an essentially unchallenged
alternative theory supports the judgment that the Johnstons own an express easement permitting
ingress and egress to Lake Travis via the Point and Notch. As previously noted, the district court
made legal conclusions that the Johnstons had acquired a "perpetual express easement appurtenant"
that ran with each of their seven lots. These lots included "Offutt Parcels Nos. 2 and 3." The
express easement that Annie Stewart's estate granted with those two lots, the court further found,
and the evidence conclusively establishes, affords "the Grantees, their heirs and assigns, the right
of ingress and egress to and from said property and to and from the waters of Lake Travis over the
existing roadways." By the date of this deed, 1965, it is established by other unchallenged findings
and undisputed evidence that Hurst View had been opened, (13) and that the remainder of "the roadway
connecting Oak Hurst Road with the Davis Parcel," as well as the "roadway on the Davis Tract,"
including the lake-access loop, had existed since the early 1950s. Consequently, an easement over
"the existing roadways" on Graveyard Point circa 1965 would have encompassed the entirety of the
easement route declared by the district court. (14) Accordingly, we overrule appellants' first issue with
respect to the Johnstons.

 However, we emphasize again that, per our disposition of appellants' second issue,
the express easement granted in the 1965 deed to the Offutt Nos. 2 and 3 lots is limited solely to a
right of "ingress and egress to Lake Travis," not the right to maintain boats and boat docks and
engage in broader recreational activities. If the Johnstons possess any broader rights to use the Point
or Notch, they, like the Gays, must look to legal sources outside of any express easements they own. 

Prescription?

 In their fifth issue, appellants challenge the legal and factual sufficiency of the
evidence supporting the district court's findings and conclusions that appellees had acquired the
positive easements declared in the judgment under a prescription theory. A prescriptive easement
may arise from a property owner's knowing acquiescence (whether actual or constructive) in a
claimant's adverse use of the property under a claim of right continuously for ten years or more. See
Scott v. Cannon, 959 S.W.2d 712, 721 (Tex. App.--Austin 1998, pet. denied); Wiegand v. Riojas,
547 S.W.2d 287, 290 (Tex. Civ. App.--Austin 1977, no writ). The ten-year requirement may be
established by tacking successive interests if there is "'privity of estate between each holder and his
successor.'" Boerschig v. Southwestern Holdings, Inc., 322 S.W.3d 752, 756 (Tex. App.--El Paso
2010, no pet.) (quoting Tex. Civ. Prac. & Rem. Code Ann. § 16.023 (West 2002) for proposition that
tacking allowed for establishing prescriptive easement); Kleckner v. McClure, 524 S.W.2d 608, 611
(Tex. Civ. App.--Fort Worth 1975, no writ) (noting that successive periods of adverse possession
by those in privity can be tacked or added together to satisfy 10-year limitations period). Likewise,
once a prescriptive easement is established, it can be passed on to successors. See First Nat'l Bank
v. Beavers, 602 S.W.2d 327, 329 (Tex. Civ. App.--Texarkana 1980, no writ) (citing Martin v. Burr,
228 S.W. 543 (Tex. 1921)).

 The "adverse" use that can give rise to prescription is the same required to prove
adverse possession. See Scott, 959 S.W.2d at 722. It requires that the claimant have acted under a
"claim of right"--with intent to use the property in a particular way permanently, as a matter of
right, as distinguished from merely trespassing or using the property with or subject to the rightful
owner's permission. See Vrazel v. Skrabanek, 725 S.W.2d 709, 711 (Tex. 1987); Ellis v. Jansing,
620 S.W.2d 569, 571-72 (Tex. 1981). Relatedly, the claim of right must be inconsistent with the
landowner's legal rights to use the property, see Scott, 959 S.W.2d at 722, although this "does not
require an intention to dispossess the rightful owner, or even know there is one," see Tran v. Macha,
213 S.W.3d 913, 915 (Tex. 2006) (per curiam).

 The adverse use must also have been "open," i.e., not made in secret or stealthily, and
"notorious," either known to the property owner or so widely known in the area that the property
owner would reasonably be expected to know of it. See Cambridge Holdings, Ltd. v. Cambridge
Condos. Council of Owners, No. 03-08-00353-CV, 2010 WL 2330356, at *10 (Tex. App.--Austin
June 11, 2010, no pet.) (mem. op.) (citing Restatement (Third) of Property (Servitudes) § 2.17 cmt.
h). Similarly, the claim of right must have been "hostile," or having outward manifestations of such
nature and character as to notify the property's true owner that the claimant is asserting such a claim
and is not merely acting with or subject to the owner's permission. See Scott, 959 S.W.2d at 722;
City of Austin v. Hall, 48 S.W. 53, 55-56 (Tex. Civ. App.--Austin 1898, no writ). "As this Court
has stated, there must be a distinct and positive assertion of a right which is brought to the servient
owner's attention and which is hostile to the owner's rights." Scott, 959 S.W.2d at 722 (citing
Wiegand, 547 S.W.2d at 289). Such an assertion may come in the form of a direct verbal assertion
of a claim or be established by the character of the use of the property and surrounding
circumstances. See Orsborn v. Deep Rock Oil Corp., 267 S.W.2d 781, 787 (Tex. 1954) ("Claim of
right must be manifested by declaration or by open or visible act. If there is no oral assertion of
claim to the land brought to the knowledge of the landowner, the adverse possession must be so open
and notorious and manifested by such open or visible act or acts that knowledge on the part of the
owner will be presumed.").

 For the use of property in itself to constitute the requisite "distinct and positive
assertion" of a right in the property hostile to the owner's rights, the claimant's use of the property
must be "exclusive" of the owner's use--i.e., the claimant has excluded or attempted to exclude
the property owner from using the same property for the same purpose. See Brooks v. Jones,
578 S.W.2d 669, 674 (Tex. 1979) ("While other jurisdictions do not require the prescriptive use to
be exclusive [of] use by the owner of the land, this rule of property has long been the established
rule in Texas."). It follows--and is equally well established--that proof merely of a joint use of the
property with the owner cannot establish a prescriptive easement because it does not signal an
adverse claim of right but is consistent with permissive use. See id. at 673-74; Scott, 959 S.W.2d
at 721-22. However, this Court has previously held that proof of joint rather than exclusive use is
not necessarily fatal to a prescriptive-easement claim if the claimant makes some form of "distinct
and positive assertion" of a hostile claim of right that is separate and apart from the claimant's joint
use of the property. See Scott, 959 S.W.2d at 721-23.

 "[C]reation of an easement by prescription is not favored in the law." Wiegand,
547 S.W.2d at 289. Evidence of a prescriptive easement "must be clear and positive, and should be
strictly construed." Callan v. Walters, 190 S.W. 829, 832 (Tex. Civ. App.--Austin 1916, no writ).
Before courts will take the "severe step" of "taking real estate from a record owner without express
consent or compensation . . . the law reasonably requires that the parties' intentions be very clear."
Tran, 213 S.W.3d at 915.

 The district court made the following findings that are material to a
prescription theory:



 [Appellees] and their predecessors in title . . . have used and enjoyed the Notch (the
Desmond Tract) and the Point (the Davis Tract), including Hurst View, Hurst Creek Circle,
and the circular access roadway on the Point, to access and engage in the recreational use
and enjoyment of Lake Travis, including lingering on the shore line and water's edge and
maintaining boats and boat docks, in a manner that was open, notorious, continuous, and
exclusive, and in a hostile and adverse manner for [a] period of more than 10 years prior to
February 2, 2006. 

 The use of the Notch (the Desmond Tract) and the Point (the Davis Tract), including
Hurst View, Hurst Creek Circle, and the circular access roadway on the Point, by the
Johnstons and the Gays, and the predecessors in title to the Johnston Tracts and the Gay
Tracts, to access and engage in the recreational use and enjoyment of [] Lake Travis,
including lingering and the shore line and water's edge and maintaining boats and boat
docks, was of such a nature and character as to notify the title owners of the Notch and the
Point of a hostile claim.

 There were distinct and positive assertions by the Johnstons and the Gays, and the
predecessors in title to the Johnston Tracts and the Gay Tracts, of a right to use the Notch
(the Desmond Tract) and the Point (the Davis Tract), including Hurst View, Hurst Creek
Circle, and the circular access roadway on the Point, to access and engage in the recreational
use and enjoyment of [] Lake Travis, including lingering at the shore line and water's edge
and maintaining boats and boat docks, that were brought to the attention of the title owners
of the Notch and Point and such assertions were hostile to the owner's rights.

 There was privity of estate between each holder of this prescriptive easement right and their
successor.

 For a period of well over 10 years prior to February 2, 2006, the owners of the Johnston
Tracts and the Gay Tracts, their guest[s], family members, and invitees have used
Hurst View, the Notch and the Point, including the portion of Hurst Creek Circle and circular
access roadway on the Point, to access and engage in the recreational use and enjoyment of []
Lake Travis, including maintaining of boats and boat docks, swimming, fishing, picnicking,
sunbathing, use of umbrellas or other sunshades, barbequ[e]ing, recreational games,
nighttime use, boat launching, automobile and other vehicle parking while engaging in
recreational activities, and automobile and boat trailer parking while boating or fishing, and
all other similar lawful uses of shoreline at the water's edge fronting the Notch and the Point.




 Appellants do not challenge the district court's findings regarding the nature of the
uses of the Point and Notch by appellees and their predecessors or that such uses met the
requirements of being "open," "notorious," and "continuous" for ten years or more; indeed, they
stipulated to many of these facts at trial. See Brooks, 578 S.W.2d at 673; Scott, 959 S.W.2d at 721. 
They focus instead on the court's findings regarding the adversity, hostility, and exclusivity
of the uses.

 Appellants contend that the evidence was legally insufficient to support the
district court's findings of adversity and hostility because the evidence is conclusive that the uses,
including the mooring of boat docks, began with a grant of permission from Arthur Stewart, the
executor of Annie Stewart's estate. They rely on the testimony to this effect from Mary Stewart
Hicks, to which we alluded previously, and invoke the well-established rule that continuous use of
an easement by permission of the servient estate owner, "no matter of what period of time, cannot
subsequently ripen into a prescriptive right." See Wiegand, 547 S.W.2d at 290. Under this rule,
moreover, it is presumed that any use of the property following the grant of permission continues
to be permissive rather than adverse. Id. To rebut this presumption and "transform permissive use
of an easement into an adverse use, there must be a distinct and positive assertion of a right which
is brought to the servient owner's attention and which is hostile to the owner's rights." Id. 
Appellants urge that any uses of the Point and Notch by appellees' predecessors thus originated as
permissive use and that the earliest "distinct and positive assertion[s] of a right . . . hostile to the
owner's rights" capable of rebutting the presumption of continued permissive use were appellees'
September 2001 claims to the Stewart heirs' counsel invoking the express easements in their deeds. 
Although appellants acknowledge that appellees' continued use of the Point and Notch would likely
have been considered adverse and hostile from that point forward, they emphasize, and it is
undisputed, that their acquiescence in the use thereafter ended well short of the ten-year period
required for prescription.

 Although adversity can be inferred from the nature and circumstances of the use,
see Scott, 959 S.W.2d at 721-22, there is no evidence that directly controverts Hicks's assertion that
third-party use of the Point and Notch began with a grant of permission from Arthur Stewart.
Consequently, if Hicks's testimony to that fact is credited, it would negate, as a matter of law, any
inference that subsequent uses were adverse until there occurred a "distinct and positive assertion
of a right which is brought to the servient owner's attention and which is hostile to the owner's
rights" beyond the mere continuation of the use that originated with permission. See Wiegand,
547 S.W.2d at 290. Appellants urge that the district court was bound to credit Hicks's testimony
on this point because it was uncontroverted and, in their view, conclusive. See City of Keller,
168 S.W.3d at 815 (explaining that conclusive evidence of a fact cannot be disregarded). Evidence
is conclusive "only if reasonable people could not differ in their conclusions, a matter that depends
upon the facts of each case." See id. at 816. In other words, Hicks's testimony that her uncle Arthur
gave permission to use the Point and Notch property would be conclusive, and legally binding on
the district court, if a reasonable fact-finder could logically infer only that it was true and could
not logically infer that it was false or inaccurate. See id. Uncontradicted witness testimony is said
to be conclusive when it is clear, direct, positive, free from contradictions, inconsistencies,
and circumstances tending to cast suspicion on it. See Ragsdale v. Progressive Voters League,
801 S.W.2d 880, 882 (Tex. 1990) ("'[W]here the testimony of an interested witness is not
contradicted by any other witness, or attendant circumstances, and the same is clear, direct and
positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion
thereon, it is taken as true, as a matter of law.'" (quoting Cochran v. Wool Growers Cent. Storage
Co., 166 S.W.2d 904, 908 (Tex. 1942)).

 Although "[i]t is impossible to define precisely when undisputed evidence becomes
conclusive," see City of Keller, 168 S.W.3d at 815, we are persuaded that Hicks's testimony falls
short of being incapable of being disbelieved by a reasonable fact-finder. The entirety of Hicks's
testimony regarding the permission issue consists of the following exchange:


Q. [by appellants' counsel]: Did someone in your family that you are aware of
give permission to people to use that property?


A. Yes.[ (15)]


. . . .


Q. And who would that be?


A. My uncle, Arthur Stewart.


Q. And do you know who he gave permission to or what kind of permission he
gave?


A. I know that he gave permission to people to--they could put their boat docks
down there.



Hicks did not elaborate on the basis for her knowledge of this purported grant of "permission"
beyond indicating that decades later, in the mid-2000s, she became involved in managing the
property still owned by Annie Stewart's estate; there is no indication as to whether or how Hicks
would have obtained first-hand or contemporaneous knowledge of that fact. The district court
also could have considered Hicks's young age at the time this grant of permission supposedly
occurred--during her childhood or preteen years--and that Hicks displayed some misunderstanding
and confusion when testifying to various other facts from this era. These included facts relating to
conveyances by her grandparents and her assertion, belied by the 1951 aerial photograph, that all
or part of the lake-access loop had been constructed by persons to whom Arthur had granted
"permission" to use the Point and Notch. Finally, there are portions of Hicks's testimony that a
reasonable fact-finder could have found somewhat dubious, including her insistence during cross-examination that, notwithstanding the survey that Sanders prepared showing the lake-access loop
and the fact that the heirs sold the property without warranties, she had "no idea" that the Point had
been burdened by any easements before she sold it to Davis. We are to defer to the district court's
first-hand assessments of Hicks's credibility and demeanor, and those assessments rationally
could have informed the court's view of her other testimony. See City of Keller, 168 S.W.3d at 819;
Turner v. KTRK Television, Inc., 38 S.W.3d 103, 120 (Tex. 2000) ("Because the trier of fact has the
ability to examine the witness's demeanor, we must defer to its credibility determinations."). In light
of these circumstances, we conclude that the district court could have reasonably either believed
or disbelieved Hicks's assertion that third-party use of the Point and Notch began with a grant of
permission from Arthur Stewart, and it acted within its discretion in doing the latter. See City of
Keller, 168 S.W.3d at 815-16. And, the district court having disregarded Hicks's testimony to that
fact, the testimony does not negate the adversity of the use of the properties by appellees'
predecessors in title.

 Appellants next argue that the evidence is legally or factually sufficient to support
the district court's findings of the requisite "exclusivity" of use by appellees' predecessors. As
appellants emphasize, there is no evidence that third-party use of the Point and Notch was ever
fully exclusive of the property's use by the Stewart family. Hicks described the family's use of the
property as "our access to the water" and for picnicking, fishing, and "just walking down there and
looking around, whatever," although she indicated such use by the family had become "off an[d] on"
by the 1960s or 1970s. There was also evidence that the Point and Notch functioned as a parking
area for patrons and invitees of Emmet Stewart's nearby marina during its years of operation.
Consequently, evidence merely that appellees' predecessors continuously used the Point and Notch
in the same way cannot give rise to prescription as to those common uses. See Brooks, 578 S.W.2d
at 673-74; Scott, 959 S.W.2d at 721-22.

 As appellees appear to recognize, they must instead rely on some "distinct and
positive assertion" of a hostile claim of right that is separate and apart from their predecessors'
continuous use of the property in common with the Stewarts. See Scott, 959 S.W.2d at 721-23.
Appellants urge that there is no evidence, or factually insufficient evidence, to support the
district court's findings of "distinct and positive assertions by the Johnstons and the Gays, and the
predecessors in title . . . of a right to use the Notch (the Desmond Tract) and the Point (the Davis
Tract), including Hurst View, Hurst Creek Circle, and the circular access roadway on the Point, to
access and engage in the recreational use and enjoyment of [] Lake Travis, including lingering at the
shore line and water's edge and maintaining boats and boat docks, that were brought to the attention
of the title owners of the Notch and Point [that] . . . were hostile to the owner's rights." We disagree.

 While we would reach a different result if appellees were relying solely on proof that
their predecessors used the Point and Notch for lake access and recreation in a manner similar to the
Stewarts, we think that the predecessors' decades-long uses far greater in scope--their maintenance
of boat docks at the Point and Notch--amount to the sort of "distinct and positive assertion" that can
distinguish an adverse and hostile claim of right from joint (and presumptively permissive) use. 
There is no contention that the Stewarts ever maintained a boat dock at the Point or Notch;
consequently, that use of the property is not a joint use in common with the Stewarts' use. Also,
while the right to maintain a boat dock is analyzed under the rubric of a "use" of property and thus
easement law rather than the doctrine of adverse possession, (16) such a use is possessory in nature, akin
to locating a mobile home or other structure on the property. A boat dock of this type floats on the
water near shore, but it must be physically attached or anchored to the dry land to keep it from
drifting and it must be close enough to the land for access, which access often includes a ramp of
some sort that is also attached to the land. It is also exclusive in nature--in fact, there was evidence
that at least some of the boat docks at the Point and Notch had "no trespassing" signs, and there is
no evidence that the Stewarts ever used the boat docks. In these ways, this type of "use" is more
closely analogous to the construction of the garage and driveway referenced in Tran--i.e., "We agree
that building a structure on property may be sufficient evidence of adverse possession." Tran, 213
S.W.3d at 915--than it is to the mere use of the garage and driveway. See id. It is a use that is
uniquely adverse or hostile to the servient estate and it is a possessory-type use in that it requires
some form of continuing, physical possession, albeit small, of the real property.

 As for whether or when the maintenance of boat docks was ever brought to the
Stewarts' attention, see Wiegand, 547 S.W.2d at 290, the district court was within its discretion to
credit Hicks's acknowledgment that the family was aware of those activities from their inception.
For these reasons, we conclude that there is legally and factually sufficient evidence of the requisite
adversity and hostility in the uses of the Point and Notch by appellees' predecessors, notwithstanding
the more limited range of joint uses they shared in common with the Stewarts. (17)

 Appellants also suggest that the requisite adversity and hostility are lacking because
it is undisputed that appellees' predecessors' use of the Point and Notch was not exclusive of
other third parties. Appellants assert that the predecessors' use "did not differ materially from
contemporaneous recreational use by the public generally." See Fannin v. Somervell Cnty.,
450 S.W.2d 933, 935 (Tex. Civ. App.--Waco 1970, no writ) (holding that prescriptive easement
could not arise on unenclosed waterfront property used by general public solely for recreation and
pleasure). As an initial observation, the evidence, contrary to appellants' assertions, supported the
reasonable inferences that (1) only a relatively limited number of third parties maintained boat docks
at the Point and Notch during the relevant period--witness estimates indicated 4-5 total at most, and
the aerial photographs showed as few as two--and (2) these third parties consisted of fellow
owners of lots on Graveyard Point. Relatedly, while we have sometimes stated imprecisely that a
prescriptive easement claimant's use of property must be "exclusive" not only of the property owner,
but "of all other persons," (18) this is plainly not the case literally. See Reid Estates Civic Club
v. Boyer, Inc., No. 01-09-00282-CV, 2011 WL 6938513, at *12 (Tex. App.--Houston [1st Dist.]
Dec. 29, 2011, no pet.) (mem. op.). For example, we have recognized that parallel prescriptive
easements can ripen simultaneously in favor of more than one claimant based upon acts that manifest
independent adverse and hostile claims of right. Nickels v. Casburg, No. 03-05-00027-CV,
2009 WL 1708830, at *16 (Tex. App.--Austin June 18, 2009, pet. denied) (mem. op.) (holding that
sufficient evidence supported findings that over twenty-five property owners in subdivision had
acquired prescriptive easements over waterfront property through collective longstanding use by
themselves and their predecessors). More broadly, the role of the "exclusivity" inquiry, again, is to
distinguish adverse and hostile third-party uses from those that are equally consistent with uses
subject to permission. See Brooks, 578 S.W.2d at 673-74; Scott, 959 S.W.2d at 721-22. While uses
in common with members of the general public are considered consistent with permissive use,
see Othen v. Rosier, 226 S.W.2d 622, 627 (Tex. 1950) (citing Weber v. Chaney, 5 S.W.2d 213, 214
(Tex. Civ. App.--San Antonio 1928, writ ref'd)); Fannin, 450 S.W.2d at 935, there is proof of more
than that here.

 Finally, appellants argue that to the extent any appellees hold an express easement
permitting "ingress and egress" over the Point and Notch, it could not be enlarged by prescription.
See McNally v. Guevara, 989 S.W.2d 380, 383 (Tex. App.--Austin 1999), rev'd on other grounds,
52 S.W.3d 195 (Tex. 2001) (relying on Kearney & Son v. Fancher, 401 S.W.2d 897, 903-05
(Tex. Civ. App.--Fort Worth 1966, writ ref'd n.r.e.), to hold that holder of express easement
permitting ingress and egress "cannot enlarge that right to include parking by prescription"). This
argument is applicable solely to the Johnstons because we have held that only they, not the Gays,
hold an express easement permitting ingress and egress over the Point and Notch. Nevertheless, we
disagree that these cases establish a categorical rule that the holder of an express easement cannot
obtain a prescriptive easement.

 First, Kearney did not hold that a "a grant of a specific easement may not be enlarged
by prescription," see McNally, 989 S.W.2d at 383; rather, in construing the text of the express
easement, it relied on the general rules regarding contract construction to hold that because the terms
of the grant were specific--i.e., "to use the railroad switch track and grounds"--"the limits of the
use may not be enlarged" to include a general right to use the property as a driveway after the
property was no longer being used for railroad purposes. See Kearney, 401 S.W.2d at 903. And in
addressing the possibility of an enlargement through prescription, the Kearney court relied not on
the above expressed rule regarding expansion of an express easement, but on the fact that the party
asserting such a claim had signed an agreement that any use of the easement in excess of the
express grant "will be permissive only, and shall not be the basis of any prescriptive right or rights."
Id. Thus, Kearney does not control our decision here. As to McNally, which relies solely and
completely on Kearney for the proposition that a specific easement may not be enlarged by
prescription, it is distinguishable because it did not involve the distinct and positive assertion of a
right that is completely outside the scope of the express easement--i.e., hostile to the owner's rights. 
In contrast, as discussed above, the facts of this case show that appellees' use of appellants' property
to moor their boats was a distinct and positive assertion of a right that was hostile to appellants'
rights without regard to their express easement for ingress and egress to Lake Austin.

 We overrule appellants' fifth issue challenging the district court's findings and
conclusions supporting a prescription theory. Because this theory independently supports the
positive easements declared in the district court's judgment, we need not reach appellants' challenges
regarding the alternative estoppel and implication theories on which the court relied. See Tex. R.
App. P. 47.1.


Negative implied restrictive covenant

 In their sixth issue, appellants contend that the evidence was legally and factually
insufficient to support the district court's judgment that a negative implied reciprocal restrictive
covenant bars commercial use of the Point and Notch. We agree.

 As previously noted, it is undisputed that neither the Point nor the Notch is burdened
with any express restriction prohibiting their commercial use. In holding that a commercial-use
restriction existed nonetheless, the district court relied on what is known as the implied reciprocal
negative easement (or, more generally, equitable servitude) doctrine. The Texas Supreme Court has
articulated the following "reasonably accurate general statement of the doctrine":


[W]here a common grantor develops a tract of land for sale in lots and pursues a
course of conduct which indicates that he intends to inaugurate a general scheme or
plan of development for the benefit of himself and the purchasers of the various lots,
and by numerous conveyances inserts in the deeds substantially uniform restrictions,
conditions and covenants against the use of the property, the grantees acquire by
implication an equitable right, variously referred to as an implied reciprocal negative
easement or an equitable servitude, to enforce similar restrictions against that part of
the tract retained by the grantor or subsequently sold without the restrictions to a
purchaser with actual or constructive notice of the restrictions and covenants.



Evans v. Pollock, 765 S.W.2d 465, 466 (Tex. 1990) (quoting Minner v. City of Lynchburg,
129 S.W.2d 673, 679 (Va. 1963)) (citations omitted). In order to impose a restrictive covenant by
implication on property retained by the original grantor, there must be evidence that (1) the grantor
intended to adopt a scheme or plan of development that encompassed both the property conveyed
and the property retained, and (2) the grantor subdivided the property into lots and included in the
deeds of the properties conveyed substantially uniform restrictions designed to further the scheme
or plan. See id. Under these circumstances, the burden the grantor has placed on the land conveyed
is considered to be imposed, by operation of law, on the land he retained. See Saccomanno v. Farb,
492 S.W.2d 709, 713 (Tex. Civ. App.--Waco 1973, writ ref'd n.r.e.) (citing 20 Am. Jur. 2d
Covenants, Conditions and Restrictions § 733 (1965)). When seeking to impose the restrictive
covenant on property retained initially by the grantor but subsequently sold to a third party, there
must also be evidence that the subsequent purchaser had actual or constructive notice of the
existence of those restrictions on the other properties included in the scheme or plan of development.
See Evans, 792 S.W.2d at 466.

 As this Court recently emphasized in rejecting two similar attempts to impose a
negative implied restrictive covenant on other Graveyard Point tracts based on a supposed "common
scheme or plan of development" intended by A.K. and Annie Stewart, "'the doctrine should
be used and applied with extreme caution, for it involves difficulty and lodges discretionary
power in a court of equity to deprive a man of his property, to a degree, by imposing a servitude
by implication,' . . . a practice consistent with 'the settled rule in Texas that alleged restrictive
clauses in instruments concerning real estate must be construed strictly, and all doubts . . . resolved
in favor of the free and unrestricted use of the property.'" Harbor Ventures, 2012 WL 1810205,
at *3 (quoting Saccomanno, 492 S.W.2d at 713); accord Crosswater Yacht Club, 2012 WL 1810213,
at *3.

 In support of its legal conclusion that "[t]he Notch and the Point are subject to a
negative implied restrictive covenant that no commercial enterprises can ever be operated on the
property," the district court found that "[a] common grantor developed the area surrounding the
Notch and the Point for sale in lots and pursued a course of conduct indicating a general plan or
scheme of development that purchasers of these lots would be (1) restricted from engaging in
commercial enterprises and (2) granted express easements to access and engage in the recreational
use and enjoyment of Lake Travis over a specified roadway ending at the Notch and the Point." In
support of the court's finding that the required "general plan or scheme of development" existed
were two sets of underlying findings. First, the court relied on findings that "[t]he substantial
number of deeds from A.K. and Annie Stewart, and later their heirs, used to convey the lots
surrounding the Notch and Point to grantees, other than heirs of A.K. and Annie Stewart, contain a
substantially uniform restrictive covenant preventing the operation of commercial enterprises on the
lots and tracts," which in turn "indicates the common grantors had a general plan or scheme of
development that the area later known as the Notch and the Point would be restricted from
commercial use." Second, the court relied on a finding that:


A.K. and Annie Stewart's plan and scheme of development must have been that the
Notch and the Point would not be used for commercial enterprises because it would
have been nonsensical to provide that no commercial enterprises could ever be
operated on any of the tracts immediately inland and then allow a commercial
enterprise on the area reserved and burdened by the unqualified and perpetual express
easements appurtenant granting the right to access and engage in the recreational use
and enjoyment of Lake Travis at this location.



Neither set of findings can support the existence of the required common development plan
or scheme.

 As we held in connection with appellants' first and second issues, the premise that
the Stewarts pursued a common, uniform scheme or plan under which they granted "unqualified and
perpetual express easements appurtenant granting the right to access and engage in the recreational
use" of the Point and Notch is contrary to the unambiguous text of the easements Annie Stewart
granted in her deeds to appellees' lots, not to mention her deeds to other lots along Oak Hurst. And
absent any support for that erroneous premise regarding positive easements, the sole basis reflected
in the findings for inferring the existence of a common scheme or plan entailing commercial-use
prohibitions is that "a substantial number of deeds" from A.K. and Annie Stewart, and later their
heirs," imposed "a substantially uniform restrictive covenant preventing the operation of commercial
enterprises on the lots and tracts." This is not enough to establish a negative implied restrictive
covenant. As we held in both Harbor Ventures and Crosswater Yacht Club, "[t]he fact that the
original grantor inserts substantially similar restrictions in deeds of property conveyed, standing
alone, is no evidence of a scheme or plan of development that could justify a similar implied
restriction on property the grantor retained." See Harbor Ventures, 2012 WL 1810205, at *5;
accord Crosswater Yacht Club, 2012 WL 1810213, at *4. Consequently, as was true in those cases,
the district court erred in concluding from those findings that the Point and Notch are burdened by
a negative implied restrictive easement prohibiting commercial use. In any event, the evidentiary
record in this case leads us to echo the same observation we made in Harbor Ventures: "even if it
could be inferred that A.K. and Annie Stewart did have some sort of general plan or scheme of
noncommercial development, the record suggests that any such plan encompassed only the
landlocked properties . . . and did not include lakefront tracts" where commercial use restrictions
were typically not imposed in their conveyances of those properties and a family member
even operated a marina on one of those tracts for several years. Harbor Ventures, 2012 WL
1810205, at *6. (19)

 For similar reasons, we also hold that the district court erred in making an additional
legal conclusion that appellants were collaterally estopped from relitigating "the enforceability of
the negative implied restrictive covenant against engaging in commercial enterprises on the Notch
or the Point" by virtue of the Mabry judgment. Collateral estoppel, or issue preclusion, is designed
to promote judicial efficiency, protect parties from multiple lawsuits, and prevent inconsistent
judgments by precluding the relitigation of issues. A party seeking to assert the bar of collateral
estoppel must establish that (1) the same facts sought to be litigated in the second action were fully
and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action;
and (3) the party against whom the doctrine is asserted was a party or in privity with a party in the
first action. Sysco Food Servs., Inc. v. Trapnell, 890 S.W.2d 796, 801-02 (Tex. 1994). Collateral
estoppel "is more narrow than res judicata in that it only precludes the relitigation of identical issues
of facts or law that were actually litigated and essential to the judgment in a prior suit." Van Dyke
v. Boswell, O'Toole, Davis & Pickering, 697 S.W.2d 381, 384 (Tex. 1985). As appellants observe,
the Mabry litigation concerned one of the large shoreline tracts that Annie Stewart gifted among her
seven children--all without commercial use restrictions--in 1949 and the manner in which the
grantee, Ernest Stewart, subdivided and developed the tract thereafter. The pivotal finding on which
the trial court's judgment turned was "[t]he fact that every tract which was sold by Ernest C. Stewart
contained the same restrictive covenant indicates that Ernest C. Stewart had the general plan that
the block of land on the tip of the peninsula would be restricted from commercial use." These are
not the same facts that were at issue in regard to the implied negative restrictive covenant theory in
this case. Collateral estoppel did not bar appellants from litigating those facts here. See Van Dyke,
697 S.W.2d at 384.

 We sustain appellants' sixth issue.


Counterclaims

 In their seventh and final issue, appellants request that, to the extent we reverse
the district court's judgment awarding relief to appellees, we likewise render judgment on their
declaratory counterclaims and remand the attorney's fee award. We will do so. See Tex. Civ. Prac.
& Rem. Code Ann. § 37.009; Roberson v. City of Austin, 157 S.W.3d 130, 137 (Tex. App.--Austin
2005, pet. denied). (20) On remand, the district court should similarly revisit its permanent injunction
to the extent this relief was predicated on its erroneous declaration that a negative implied restrictive
covenant barred commercial use of the Point or Notch. Coleman, 514 S.W.2d at 903 (use incident
to easement is limited to that "reasonably necessary and convenient and as little burdensome as
possible to the servient owner"); see also State v. Brownlow, 319 S.W.3d 649, 656 (Tex. 2010)
("[T]he rights reasonably necessary for full enjoyment of an easement are limited. They do not
encompass rights foreign to the purpose for which the easement is granted. The servient estate
holder retains these rights."). We sustain appellants' seventh issue.


CONCLUSION

 Based on a prescription theory, we affirm the district court's judgment declaring that a
positive easement permits appellees to use the Point and Notch for access to Lake Travis, to maintain
boat docks and boats, and engage in various recreational activities there. However, we reverse its
judgment that the properties are burdened by a negative implied restrictive covenant prohibiting
commercial use and render judgment that they are not. We remand the parties' attorney's fee claims
and appellees' claims for injunctive relief for reconsideration in light of our holdings.



 __________________________________________

 Bob Pemberton, Justice

Before Chief Justice Jones, Justices Pemberton and Henson

Affirmed in part; Reversed and Remanded in part

Filed: June 28, 2012




1. A directional arrow is provided in the margin of Appendix A.
2. The Dolan easement provided:


It is hereby agreed and understood that the roadway now open on the East of the land
herein conveyed shall always be open and shall never be closed by any party, and
grantees, their heirs and assigns, shall have the right to use this roadway for the
purpose of ingress and egress to Lake Travis.
3. Hicks indicated that she was born around 1940.
4. Over appellants' objection, a copy of the Mabry judgment and findings of fact and
conclusions of law were admitted into evidence below.
5. See Debbie Desmond, Dennis Davis, Individually and d/b/a Aqua Tech Marine; and Aqua
Tech Marine Indus., Inc. v. Wanda Mabry, Roy Mabry, Marquette Mabry, and Mary Sue Wheeler,
No. 03-04-00316-CV, slip op. ¶ 1 (Tex. App.--Austin Jan. 28, 2005, pet. denied) (mem. op.),
available at http://www.3rdcoa.courts.state.tx.us/opinions/pdfOpinion.asp?OpinionID=13451.
6. To be precise, only the Johnstons and Steven Gay were originally plaintiffs, but
Carilynne Gay joined in these claims after appellees named her as a defendant to their claims, along
with the three original plaintiffs.
7. See Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2008). 
8. This finding or conclusion also referenced the Menn, Offutt No. 1, and McClanahan deeds
in the Johnstons' chains of title, but this appears predicated on erroneous findings that the language
of these easements tracked the easement in the Sassman deed. As previously explained, those
three deeds, unlike the Sassman and Dolan deeds, did not purport to grant any right of access to
Lake Travis. The substance of the court's finding or conclusion thus corresponds more precisely to
the language of the Sassman and perhaps the Dolan deed, and the Johnstons have primarily
emphasized the Sassman deed on appeal.


 Similarly, although the district court's legal conclusions state that the Gays have express
easements in the chains of title to all three of their properties, it made no underlying findings
that Annie granted such an easement in the Ross deed, and the evidence conclusively negates such
an assertion. As previously noted, Annie did not grant any easement in the Ross deed or, for that
matter, in the Gibson deed she executed around the same time in 1946. Consequently, as the Gays
seem to acknowledge, they must rely solely on the express easement contained in the Frazer deed. 
9. See Webster's Third New Int'l Dictionary 1574 (2002) (defining "on" as a word used to
indicate "contiguity" or a "position with regard to place, direction, or time").
10. See Fort Worth & N.O. Ry. Co., 18 S.W. 206, 208 (Tex. 1891) (noting that "in" denotes
"nearness" or "proximity" more definitely than "at" does); Blackert v. Dugosh, 145 N.E.2d 606, 607
(Ill. 1957) (holding that preposition "on" was "strongly indicative on an intent to convey" abutting
land in deed under consideration); see also Webster's at 1574 (emphasizing contiguity definition of
"on" as "location closely adjoining something . . . or location very near some point of a narrowly
extended area").
11. In support of this theory, the district court found that the 1951 aerial photograph in
evidence "depicts the roadway now named Oak Hurst as an inverted "U" shaped road that does not
provide an access route to Lake Travis."
12. At trial, appellees also advanced a theory that the dedication of roadways in the 1961 plat
of the Annie Stewart Subdivision had independently granted both the Gays and Johnstons an
easement over the roadways to and over the Point and Notch. Appellees do not appear to rely on this
theory on appeal, although they reference the dedication as support for their estoppel theory.
Similarly, while the district court's finding of fact and conclusion of law referenced the 1961
dedication in regard to appellees' estoppel theory, the court did not appear to rely on the dedication
to support its conclusions regarding an express-easement theory. To the extent that the court's
conclusions or judgment did rest upon an express-easement theory predicated on the 1961
dedication, it would be in error. Among other things, the dedication does not depict the Point or
Notch or any roads there.
13. Although they hotly disputed whether the road now known as Hurst View had been
opened by the time of Annie's earlier conveyances, appellants acknowledge that it was open by 1951.
Consequently, it is beyond dispute that Hurst View was an "existing roadway" thereafter.
14. To the extent it might be debatable whether the lake-access loop on the Point would be
considered a "roadway" within the meaning of the easement, that issue would be obviated by
application of the following principle: Where an express easement is described generally, without
indicating its location (e.g., precisely where or how one was to obtain "ingress and egress to and
from the waters of Lake Travis over the existing roadways") and the grantor does not specify its
location, the grantee's use of the easement, with the grantor's consent or acquiescence, is sufficient
to establish the easement's location. See Vinson v. Brown, 80 S.W.3d 221, 228 (Tex. App.--Austin
2002, no pet.). At trial, as previously noted, the parties stipulated that Douglas Offutt, the original
grantee of Offutt parcels 1, 2, and 3, and who had also acquired several other lots in in the Johnstons'
chains of title, "used Hurst View and [appellants'] properties to access Lake Travis . . . from at least
1958 through 1985," and unchallenged findings reflect that Offutt and other predecessors in title
"have used Hurst View, the Notch, and the Point, including the entire circular access roadway on
the Point to access . . . the lake continuously since as early as 1958." The findings, stipulations, and
evidence would have served to fix the location of the easement as the path of the lake-access loop
and any intervening portions of the Point or Notch between the loop and the water.
15. Appellees' counsel attempted to object to the question on grounds of speculation, but
Hicks intoned the answer before counsel could assert it.
16. See, e.g., Werchan v. Lakewood Estates Ass'n, No. 03-08-00417-CV, 2009 WL 2567937,
at *4-9 (Tex. App.--Austin Aug. 21, 2009, pet. denied) (mem. op.) (analyzing existence of
prescriptive easement allegedly established by mooring a floating dock on alleged servient estate).
17. Hicks's testimony that "the people that used our property" had constructed all or part of
the lake-access loop, including moving large rocks and felling trees, was also evidence of the sort
of distinct and positive assertion of a hostile claim of right that could distinguish adverse use
notwithstanding joint use. See Reid Estates Civic Club v. Boyer, Inc., No. 01-09-00282-CV,
2011 WL 6938513, at *6 (Tex. App.--Houston [1st Dist.] Dec. 29, 2011, no pet.) (mem. op.)
(involving acts extending and improving roadway); Boerschig v. Southwestern Holdings, Inc.,
322 S.W.3d 752, 766 (Tex. App.--El Paso 2010, no pet.) (involving acts enclosing road with fence
on one side and gate on one end); Terrill v. Tuckness, 985 S.W.2d 97, 108 (Tex. App.--San Antonio
1998, no pet.) (building fence around tract). However, the evidence falls short of permitting a
reasonable inference as to whether any of appellees' predecessors, as opposed to other third-party
users of the property, were involved in the construction. See Tran v. Macha, 213 S.W.3d 913, 915
(Tex. 2006) (declining to find possession hostile despite existence of improvements because
evidence only showed who used driveway and garage, but not who built them).
18. See Werchan, 2009 WL 2567937, at *5.
19. Of course, Harbor Ventures and Crosswater Yacht Club, founded as they are on the
unique "findings, conclusions, and judgments of other trial courts . . . involving different parties,
facts, and arguments," do not dictate or control the result in this case. See Crosswater Yacht Club,
2012 WL 1810213, at *5. Our analysis is instead based upon the governing legal principles applied
to the record here.
20. Appellants also complain that the district court improperly awarded appellate attorney's
fees to appellees conditioned on appellants' failure to be "successful in completely reversing this
judgment." (Emphasis added.) The district court should also address this issue on remand.